UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
―――――――――――――――――――――――――――――――――X
CAROL A. CUMBERBATCH,

                                   Plaintiff,

                                                              COMPLAINT

—Against—                                      JURY TRIAL
                                                              DEMANDED

WILBUR L. ROSS, Secretary
U.S. Department of Commerce
                                   Defendant
―――――――――――――――――――――――――――――――――X

    Plaintiff, CAROL A. CUMBERBATCH, by his/her attorneys, Law Offices of Ambrose Wotorson, for her Complaint, alleges as follows:

I.    <u>INTRODUCTION</u>

1. Plaintiff, CAROL A. CUMBERATCH, whom at all relevant times, served as a Regional Survey Manager for the U.S. Department of Commerce's Census Bureau, contends that she was terminated because of race, sex, age and protected activities.

II.    <u>JURISDICTION</u>

2. This Court has jurisdiction over this matter under 42 USC Section 2000e and 29 U.S.C. Section 215 (a)(3). Venue is proper because the acts complained of occurred in this Judicial District. Moreover, this suit is being filed before the expiration of 90 days after plaintiff's receipt of a final agency action/right to sue letter from the U.S. Department of Commerce.

III.  PARTIES

3. Plaintiff, An African-American woman was, at all relevant times, a Regional Survey Manager with the New York Regional Office of the U.S. Census Bureau.

4. She served in this capacity from February 6, 2017 until her termination, on December 27, 2017, in part, because of her alleged "tone".

5. All all relevant times, plaintiff severed as an hourly employee and was non-exempt even though she had "managers" position, as plaintiff was required to keep track of her time, and she was paid by the hour. Indeed, plaintiff was required to work on Saturdays, and though she frequently worked five hours each Saturday, she was instructed to only records four hours each Saturday, and that she would be paid overtime hours based solely upon four hours that she was instructed to record.

6. Defendant, WILBUR L. ROSS, Secretary U.S. Department of Commerce, at all relevant times, employed plaintiff as a Regional Survey Manager. The United States Department of Commerce is in the Executive Branch of the United States Federal Government and consists of various bureaus, including the United States Census Bureau.

7. The United States Census Bureau is the preeminent collector and provider of statistical data about the people and economy's ion the United States. The United States Census Bureau is responsible for the Constitutionally-

mandated Decennial Census, which each decade enumerates every individual living in the United States and identifies his or her place of residence.

IV. <u>FACTUAL AVERMENTS</u>

8. Plaintiff re-alleges paragraphs 1- 7 as fully-stated above.

9. Plaintiff was was assigned to work as Regional Survey Manager in a Grade 9, step 1 position, despite the fact that her previous three and a half year stint with the Federal Deposit Insurance Corporation, was at a considerably higher Grade 12, Step 10 position.

10. Further at the time of hire, on or about February 6, 2017, plaintiff had ten (10) years of financial sector experience.

11. In any event, defendant failed to give plaintiff additional survey training despite her reasonable request for the same, and the availability of additional training courses.

12. Plaintiff repeatedly requested such training beginning in April 2019 May and continuing until the time of her termination

13. Plaintiff reasonably requested additional training because her managers plaintiff felt that her initial training had been inadequate given the complexity of the survey tasks she was assigned to supervise, and "just learning in the job" was proving to be challenging. She also requested

additional training because, upon information and belief, other, similarly-situated RSMs had received, or were receiving, additional survey training.

14. In requesting additional training, plaintiff was reasonably attempting to oppose disparate treatment, and defendant was reasonably aware of plaintiff's perception of disparate treatment, since she often noted that she reasonably believed that other similarly-situated RSMs had received, or were receiving additional survey training.

15. Defendant's various responses to plaintiff's frequent requests for additional training was that she had to learn on the job; that she had to push back such additional training because the bureau was too busy; and that it was not efficient to train RSMs on most of the surveys.

16. Upon information and belief, plaintiff's frequent requests for additional training engendered unnecessary hostility towards her and led, in part, to racially and sexually stereotypical perceptions that plaintiff was argumentative and had an "attitude".

17. This racial and gender-based perception of plaintiff as an angry black woman, contributed to a hostile work environment that was pervasive and interfered with her work functions.

18. Indeed, by defendant's own admission, plaintiff was perceived as having an "attitude" and as being "mean".

19. In April 2017, plaintiff requested that she be allowed to take her annual leave in October 2017.

20. However, Defendant did not approve her leave request until September 2017, leaving plaintiff insufficient time to plan and to take her requested leave.

21. Unfortunately, that became a pattern with defendant that was partially responsible for led plaintiff being perceived as stereotypical angry black woman with an "attitude" and who was "mean".

22. Indeed, plaintiff frequently had to cancel scheduled sick leaves for medical appointments because defendant failed to resolve conflicts with the fairly rigid survey deadlines whenever plaintiff brought such scheduling conflicts to defendant's attention between April 2017 and December 2017.

23. Plaintiff frequently requested assistance in identifying surveys, their timeframes and ways to re-schedule them so that she could meet make her known medical appointments. However, defendant generally failed to assist her in resolving those scheduling conflicts with rigid survey deadlines.

24. Upon information and belief, and by defendant's own admissions, similarly-situated RSMs were generally able to resolve similar scheduling conflicts, with defendant's assistance.

25. The failure to assist plaintiff in resolving such scheduling conflicts, but assisting other similarly-situated RSMs, contributed to a hostile work

environment. In fact, one or more of plaintiff's supervisors, as a pretext to justify plaintiff's termination, later falsely claimed that plaintiff frequently argued about her leave, and failed to follow leave procedures.

26. Management had high expectations in survey performance that is difficult, and even unobtainable.  Therefore, the work environment where plaintiff was assigned could be characterized as highly stressful.

27. In fact, at least one other RSM complained in a meeting in October 2017, that he felt attacked and singled out. During the same meeting, plaintiff also stated that she felt "singled out".

28. In addition to this high stress atmosphere, plaintiff was instructed to come into the office to work on Saturdays.

29. Plaintiff complied with these compulsory Saturday workdays.

30. However, When plaintiff took a leave that fell on one of these Saturdays, defendant's managers contributed to a hostile work environment by variously suggesting that she was abrogating her responsibilities, and suggesting that plaintiff was having difficulty in her assigned position,

31. Initially, plaintiff would request credit hours in exchange for such Saturday work,  which was frequently five or more hours.

32. However, these Saturday hours were not tracked, and official bi-weekly spreadsheets did not account for Saturday-worked hours.

33. Critically, while most employees — including similarly-situated ones — performed Saturday hours at home, plaintiff was instructed to come into the office to work, and she was not afforded the option of working from her home on Saturdays.
34. Plaintiff asked to review defendant's written policies regarding credit hours and "comp" hours in October 2017 because one or more of her supervisors told her that her credit hours would be subjected to "extra scrutiny", and that management preferred that staff use "comp time", rather than credit hours.
35. Plaintiff also asked to review defendant's written policies regarding credit hours and "comp" hours, because one or more of plaintiff's managers also suggested to her that she would only be paid for four hours that she worked each Saturday, though she frequently worked five hours each Saturday.
36. When plaintiff requested written copy of policies regarding accrued time, credit hours and "comp" hours and explained that she reasonably thought that she was being singled out, and that she was not being paid according to actual hours worked, defendant's agents expressed shock and disapproval, and in fact, one of plaintiff's supervisors gave her a disapproving, and disparaging stare.
37. The manager who gave plaintiff a disapproving and disparaging stare, expressed animus towards plaintiff for making such a request and thought

that such a discussion was inappropriate and should have occurred "offline" with plaintiff's direct supervisor.

38. The manager's disapproving and disparaging stare, and expressed animus towards plaintiff's reasonable overtime compensation queries contributed to a hostile work environment for plaintiff, and the animus expressed towards plaintiff for failing to leave this issue for an "offline" discussion at another time, partially led to a stereotypical perception that plaintiff was an angry black woman, and ultimately, upon information and belief, led to plaintiff's termination.

39. In any event, plaintiff was engaging in protected activity when she suggested, by demanding to see a copy of the bureau's credit hours and comp hours policies, that she was not being paid according to the hours that she actually worked, and defendant reasonably understood plaintiff's position, which was reasonable, and not argumentative.

40. As an attempt to mitigate the hostile work environment that she was enduring, plaintiff sought to plot an escape from it by applying for vacant Space Leasing Representative promotion. However, the same manager who expressed shock at plaintiff's request to see the written credit and overtime policies, signed a letter denying her promotion in October 2017.

41. In late November and early December 2017, plaintiff sought to file complaints against her managers for creating a hostile work based upon race,

gender and age. She also sought to obtain assistance because she was suffering the effects of a traumatic life experience that she had previously suffered.

42. However, the HR representative with whom she spoke, directed her to Employee Assistance Program (EAP) to obtain counseling. When plaintiff asked to file written complaint about the the aforementioned hostile work environment, the HR representative told plaintiff could not file such a complaint and pursue EAP, at the same time, and instead, told plaintiff to use time to think about applying for new position within the agency.

43. This HR representative does not deny plaintiff's allegations, but merely claims to have no recollections and no records of plaintiff's specific complaints and requests.

44. Indeed, the HR representative – who ultimately helped to draft plaintiff's termination letter — claims to not recall referring plaintiff to EAP, and critically, does not deny that she advised plaintiff's managers that she sought EAP or wanted to file a complaint about harassment or a hostile work environment. Instead, she merely claims to not remember doing so, and she claims to have no records evidencing the same.

45. On December 13, 2017 — while plaintiff was out on a brief medical leave of absence — one of plaintiff's managers wrote a memorandum purporting to document plaintiff's alleged failings, including an allegation that plaintiff

had requested five (5) hours of overtime even though management had only allowed her to request 4 hours overtime.

46. Plaintiff was receiving mental health counseling when she took a medical leave of absence from December 12, 2017 to December 17, 2017. She returned to work on December 20, 2017, and seven (7) days later, she was terminated on December 27, 2017.

47. The termination letter, which the HR representative helped to draft, indicated that plaintiff was terminated because she had time and leave issues, and because she had an argumentative "tone" with her supervisors.

48. In fact, these explanations are pretextual and plaintiff was actually terminated because she was subjected to a racial and sexual stereotype of a an angry black woman.

49. Plaintiff reasonably sought to oppose disparate treatment, and because she suggested that defendant was failing to pay to her appropriate overtime. The animus that plaintiff's reasonable, good-faith positions engendered led to her eventual termination due to her race, sex, age and protected activities.

50. Plaintiff has lost a yearly salary that she would have had but for her wrongful discharge.

51. Plaintiff has suffered humiliation and anguish as a proximate result of his/her suddenly being unemployed.

52. Plaintiff's good name and reputation has been been damaged because there is now a hard-to-explain gap in her resume that has adversely-impacted her chances with other employers. Further, defendant has type-casted plaintiff as angry, argumentative, and "mean" with an "attitude".

53. Not surprisingly, plaintiff has a not been able to find comparable work, despite her best efforts.

V.  CAUSE OF ACTION

   FIRST CAUSE OF ACTION – Race Discrimination – 42 U.S.C. Section 2000e

54. Plaintiff re-alleges paragraphs 1 - 46 as fully-stated above.

55. Defendant discriminated against plaintiff on the basis of her race, and retaliated against her on the basis of her protected activities in opposing such discrimination.

   SECOND CAUSE OF ACTION – Race Discrimination — 42 U.S.C. Section 1981

56. Plaintiff re-alleges paragraphs 1 - 48 as fully-stated above.

57. Defendant discriminated against plaintiff on the basis of her race, and retaliated against her on the basis of her protected activities in opposing such discrimination.

   THIRD CAUSE OF ACTION – Gender Discrimination — 42 U.S.C. Section 2000e

58. Plaintiff re-alleges paragraphs 1-50 as fully state above.

59. Defendant discriminated against plaintiff on the basis of her gender and retaliated against her on the basis of her protected activities in opposing such discrimination.

<u>FOURTH CAUSE OF ACTION – Age Discrimination — 29 U.S.C. Section 621</u>

60. Plaintiff re-alleges paragraphs 1-52 as fully state above.

61. Defendant discriminated against plaintiff on the basis of her age and retaliated against her on the basis of her protected activities in opposing such discrimination.

WHEREFORE, plaintiff prays that this Court grant judgment to her containing the following relief:

    a. An impaneled jury;

    b. An award of damages for the loss of plaintiff's job, as backpay, and as front pay;

    c. An award of damages for loss of other compensation and financial harm, including past and future bonuses, commissions, including applicable fringe benefits, after the date of his/her discharge from defendant;

    d. An award of damages for humiliation, mental pain and suffering associated with plaintiff's termination, and her subsequent and unexpected unemployment;

e. The costs of this action and plaintiff's reasonable attorney's fees to the fullest extent permitted by law; and

f. Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
January 9, 2019

Respectfully Submitted
***Ambrose W. Wotorson, Jr., Esq.***
Law Offices of Ambrose Wotorson
225 Broadway, 41st Floor
New York, New York 10007
646-242-3227
Loaww1650@aol.com