L9k2CumC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  CAROL A. CUMBERBATCH,

4              Plaintiff,              New York, N.Y.

5         v.                          19 Civ. 305 (LJL)

6  WILBUR L. ROSS,
        Secretary, U.S. Department
7       of Commerce,

8              Defendant.

9  ------------------------------x    Remote Conference

10                                     September 20, 2021
                                       10:00 a.m.
11
   Before:
12
                        HON. LEWIS J. LIMAN,
13
                                       District Judge
14

15
                         APPEARANCES
16

17  AMBROSE W. WOTORSON, JR.
        Attorney for Plaintiff
18

19

   AUDREY STRAUSS
20      United States Attorney for the
        Southern District of New York
21  JEANNETTE A. VARGAS
        Assistant United States Attorney
22

23

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

L9k2CumC

1          THE COURT:  Good morning.  This is Judge Liman.

2          Matt, do we have the parties on the phone?

3          THE DEPUTY CLERK:  Yes.  We are all set in the

4   Cumberbatch v. Ross matter.

5          THE COURT:  Who is appearing for plaintiff?  Who do I

6   have on for plaintiff?

7          MR. WOTORSON:  Yes, plaintiff's counsel is here.

8          THE COURT:  Who is on for plaintiff?  Name, please.

9          MR. WOTORSON:  I'm sorry.  Ambrose Wotorson for the

10  plaintiff.  I'm sorry, your Honor.

11         THE COURT:  Good morning, Mr. Wotorson.

12         MR. WOTORSON:  Good morning.

13         THE COURT:  And for defendant.

14         MS. VARGAS:  Good morning, your Honor.  This is

15  Jeannette Vargas, from the U.S. Attorney's office for

16  defendant.

17         THE COURT:  Good morning.

18         So I have in front of me the motion for summary

19  judgment.  I am prepared to give you a ruling from the bench,

20  and then we can discuss next steps.  I am going to read the

21  opinion.

22         Defendant Wilbur Ross moves pursuant to Federal Rule

23  of Civil Procedure 56 for summary judgment.  Except where

24  otherwise indicated, the following facts are undisputed for

25  purposes of this motion.  The Court construes the facts in the

1    light most favorable to the nonmoving party.  The Court grants

2    the motion in part and denies it in part.

3              The plaintiff, Ms. Cumberbatch, who is an

4    African-American woman, was the Regional Survey Manager in the

5    New York region for the U.S. Department of Commerce from

6    February 6, 2017 until her termination on December 27, 2017.

7    At the time, she was 55 years old.  Her primary task was to

8    oversee the conduct of field surveys; at any given time, she

9    might have been supervising 100 to 150 surveyors.  Plaintiff

10   was supervised primarily by Lance Sanchez and then by Lisa

11   Moore.

12             Plaintiff alleges that, during the term of her

13   employment, she was subject to a number of adverse employment

14   actions.  She also alleges she was terminated from a position

15   as Regional Survey Manager in the New York Regional Office of

16   the U.S. Census Bureau because of her race, gender, and age,

17   and as retaliation for her participation in protected

18   activities.  The complaint alleges the following causes of

19   action: claims of race- and gender-based discrimination and

20   retaliation against protected activities in violation of Title

21   VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e *et*

22   *seq.*; a claim of race-based discrimination in violation of

23   42 U.S.C. Section 1981; and a claim of age-based

24   discrimination, in violation of Age Discrimination in

25   Employment Act of 1967, 29 U.S.C. Section 621*, et seq.*

L9k2CumC

1      Defendant argues that plaintiff has not met her burden

2  of making out a *prima facie* case of discrimination on the basis

3  of race, sex, age, or retaliation from protected activities.

4  It claims that the majority of the incidents upon which

5  plaintiff relies, such as not being able to attend certain

6  optional training meetings and delays in the approval of her

7  leave requests or the processing of her compensatory time are

8  of a *de minimis* nature and do not rise to the level of a

9  materially adverse action.  It also argues that no inference of

10  unlawful racial, gender, or age discrimination can be drawn

11  because none of plaintiff's supervisors ever used racial

12  epithets or racially charged, sexist, or ageist language

13  towards her or made any statements suggesting that their

14  actions were based on plaintiff's race, gender, or age.  She

15  also has not identified any relevant comparators.  Finally, it

16  argues that her termination was not retaliatory because her

17  supervisors had no knowledge of her alleged contact with human

18  resources.

19      Plaintiff responds that while she was terminated based

20  on her tone, there were few, if any, contemporaneous complaints

21  about her conduct and that her frequent requests for

22  training -- which were made because she perceived that

23  non-black and younger similarly situated employees had received

24  such training -- engendered unnecessary hostility towards her

25  and led in part to racially and sexually stereotyped

L9k2CumC

perceptions that plaintiff was an angry and argumentative black
woman with an attitude that led to her termination.

        "The same core substantive standards apply to both
Title VII and Section 1981 claims."  Moore v. City of New York,
745 F.App'x 407, 409.  Under Title VII and Section 1981, the
Court analyzes "race discrimination claims under the three-step
*McDonnell-Douglas* burden-shifting framework . . . first an
employee must present a *prima facie* case of race
discrimination.  To establish a *prima facie* case of race
discrimination, the plaintiff must demonstrate that: (1) she
fell within a protected class . . .; (2) she was qualified for
the position she held; (3) she was subjected to an adverse
employment action; and (4) the adverse action occurred under
circumstances giving rise to an inference of discrimination.
Second, if the plaintiff establishes a *prima facie* case, the
burden shifts to the employer to give a legitimate,
non-discriminatory reason for its actions.  Third, if the
employer proffers a reason, the plaintiff then has the burden
of showing that the employer's explanation is a pretext for
race discrimination.  To defeat summary judgment, the
plaintiff's admissible evidence must show circumstances that
would be sufficient to permit a rational finder of fact to
infer that the employer's employment decision was more likely
than not based in whole or in part on discrimination."  That's
*Fletcher v. ABM Building Value*, 775 F.App'x 8, 12.  Unlike

L9k2CumC

1    Section 1981, Title VII also covers gender-based discrimination

2    as well as race-based discrimination; gender-based

3    discrimination is subject to the same framework of analysis.

4    "To establish a *prima facie* case of age discrimination under

5    the ADEA, a claimant must demonstrate that: (1) she was within

6    the protected age group; (2) she was qualified for the

7    position; (3) she was subject to an adverse employment action;

8    and (4) the adverse action occurred under circumstances giving

9    rise to an inference of discrimination'" *Terry v. Ashcroft*, 336

10    F.3d 128, 137-38.

11         The standards for retaliation under Title VII, Section

12    1981, and the ADEA are all the same. *Gorzynski v. JetBlue*

13    *Airways Corp.*, 596 F.3d 93, 110; and *Little v. Northern*

14    *Utilities Service Company,* 299 F.App'x 50, 52. To establish a

15    *prima facie* case of retaliation, a plaintiff must prove: "(1)

16    that she participated in a protected activity; (2) that her

17    employer was aware of the activity; (3) that an adverse

18    employment action occurred; and (4) that there was a causal

19    connection between the protected activity and the adverse

20    employment action." *Reed v. A.W. Lawrence & Co.* 95 F.3d 1170,

21    1178. To be materially adverse, the employment action must

22    have "dissuaded a reasonable worker from making or supporting a

23    charge of discrimination." *Rochon*, 438 F.3d at 1219.

24         The Court starts with the retaliation claim.

25    Construing the evidence favorably to the plaintiff, she sought

1   to file complaints with defendant's human resources department

2   in late November and early December 2017 that her managers

3   created a hostile work environment based on race, gender, and

4   age.  When she asked to file a written complaint about the

5   hostile work environment, the HR representative, Kimberly

6   Merrill, told her that she could not file such a complaint and

7   pursue the employee assistance program at the same time and

8   told her to think about applying for a new position in the

9   agency.  In plaintiff's words, Merrill did not accept

10  plaintiff's request that she be permitted to file a complaint

11  or provide any information or any details.  Merrill stated that

12  plaintiff would have to discontinue the conversation and make a

13  separate request.  She also stated that, in the interim, and

14  before she filed the complaint, plaintiff should consider

15  finding another position to work in within the Census Bureau.

16  Plaintiff also testified that she tried to contact Merrill

17  three days to a week later to make a complaint about disparate

18  treatment and that she left voice messages for her but did not

19  receive a response.

20        Plaintiff's employment was terminated shortly

21  thereafter, on December 27, 2017, in a meeting with Lisa Moore

22  and one of her managers, Jared Gerstenbluth.  The termination

23  letter was drafted by Merrill.  The letter stated that

24  plaintiff had time and leave issues, and that in addition she

25  had "demonstrated inappropriate conduct by displaying

disrespectful and argumentative behavior with her supervisor."

There are some inconsistencies in the explanations for

plaintiff's termination.  One of her supervisors later stated

that although plaintiff was terminated for conduct and

performance issues, the conduct issues were more pervasive, by

which he meant plaintiff "had a very bad attitude and was mean"

and that her "attitude was off-putting."  In fact, that

supervisor stated that absences from the office were not an

issue because "there are so many people in the office, there is

always someone available for backup."  Another supervisor also

complained that plaintiff's tone was argumentative and that she

was unprofessional.  There is evidence that, prior to being

terminated, plaintiff was never told she had time or leave

issues or that she was counseled about alleged tardiness,

leave, or payroll issues.  She was not told that she was

repeatedly late.  There is an e-mail where she was criticized

for her tardiness and her tone, but that e-mail from Lisa Moore

post-dated her complaints to HR about discrimination.  She was

never disciplined or issued a disciplinary notice, memo, or

report while employed with defendant.  She was not informed of

any shortcomings in her job performance or duties prior to

being terminated and received two satisfactory performance

evaluations.  This is the evidence construed favorably to the

plaintiff.  She only received compliments from her immediate

supervisors.  With respect to her attitude, one of her

supervisors stated that he provided feedback, although he added
that he did so "very carefully."  Numerous managers testified
that they did not recall plaintiff being spoken about poorly
during a management meeting.

Defendant does not dispute that plaintiff's contact
with the HR representative constitutes protected activity.  To
prevail on a retaliation claim, the plaintiff need not prove
that her underlying claim of discrimination had merit, but only
that it was motivated by a good-faith, reasonable brief that
the underlying employment practice was unlawful.  That's *Zann
Kwan v. Andalex Group*, 737 F.3d 834, 843.  Defendant also does
not dispute that her termination would constitute an adverse
employment action.  It disputes only that her employer was
aware of the activity and that there was a causal link between
plaintiff's complaint to HR and her termination.  But there is
evidence that before plaintiff was terminated, management
conferred with Merrill and provided documentation to Merrill
and that Merrill reviewed and drafted the termination letter.
There also is evidence that Merrill conferred with plaintiff's
managers in deciding to terminate her and signed her
termination letter.  Her supervisors claim that age, sex, and
race played no role with regard to their treatment of her, but
they do not deny in their statements that they were aware of
plaintiff's complaints to Merrill and they do not address
whether the complaints played a role in her termination.  They

1   are silent with respect to that.  The evidence viewed favorably

2   to the plaintiff permits the inference that the persons who

3   decided to terminate plaintiff were aware of her complaints

4   about discrimination.  Again, *see Zann Kwan*, 7347 F.3d at 847.

5           Viewing the evidence, again, in the light most

6   favorable to plaintiff, a reasonable fact-finder could also

7   find that the termination of her employment following so close

8   on the heels of her complaints about discrimination was in

9   retaliation for her complaints about discrimination.  *Zann*

10  *Kwan*, 737 F.3d at 845 (holding that a three-week period from

11  complaint to termination was sufficiently short to make a *prima*

12  *facie* case of causation through temporal proximity).  There

13  also are fact questions regarding whether defendant has a

14  nonretaliatory reason for the plaintiff's termination.  The

15  Court's conclusion is bolstered by the evidence that (1) the

16  complaints about plaintiff's performance arose after the time

17  she approached human resources about discrimination; and (2)

18  the language about "tone" and being "argumentative," which a

19  fact-finder could find was the basis for the employment action,

20  could in the context they were used here be understood to be

21  code words language for someone who rocks the boat to complain

22  about discrimination, citing *Thelwell v. City of New York*, 2015

23  WL 4545881 at *10.  Again, the Court construes the evidence in

24  the light most favorable to plaintiff.  Defendant claims that

25  plaintiff was terminated for valid and legitimate performance

L9k2CumC

1    reasons, but that will be an issue for trial.  A fact-finder

2    could find that those reasons were pretextual in the absence of

3    any documented evidence that there were complaints about

4    plaintiff's performance prior to her protected activity or

5    prior to the protected activity a suggestion that her

6    performance could lead to her employment not being continued.

7    For those reasons, the Court will deny summary judgment to

8    defendant on plaintiff's retaliation claims.

9         The Court will grant summary judgment to defendant on

10   plaintiff's discrimination claims and hostile work environment

11   claims.  Plaintiff conceded at oral argument, and the Court

12   would conclude in any event that, with the exception of the

13   termination of plaintiff's employment, none of the acts as to

14   which plaintiff complains rise to the level of an adverse

15   employment action.  None of them affected the terms and

16   conditions of plaintiff's employment.  As to her termination,

17   plaintiff does not identify facts giving rise to an inference

18   of discrimination.  She does not identify a similarly situated

19   comparator or any racially or gender or age charged language or

20   any other evidence that would support an inference of

21   discrimination on the basis of race, age, or gender.  Likewise,

22   she does not allege any facts giving rise to a hostile work

23   environment because of race, gender, or age.  *See Agosto v. New*

24   *York City Department of Education*, 982 F.3d 86.  Her employment

25   experience was unpleasant, but she does not identify any

1   evidence it was made unpleasant for her on the basis of her

2   race, gender, or age.

3           So that's the ruling of the Court.

4           I am prepared now to give you a trial date for trial

5   of this action and also a date for the submission of the joint

6   pretrial order and for the final pretrial conference.  I will

7   give those to the two of you now, and then I will hear first

8   from the plaintiff and then from the defendant with respect to

9   any comments or anything they would like the Court to address.

10          MR. WOTORSON:  Yes, thank you.

11          THE COURT:  No.  I'm going to give you the date first,

12  and then I will hear from you, Mr. Wotorson.

13          MR. WOTORSON:  Okay.  Okay, okay.

14          THE COURT:  The trial date will be March 28 of 2022,

15  the joint pretrial order will be due March 11, 2022, and the

16  final pretrial conference will be March 23, 2022, at 4:00 p.m.

17          Mr. Wotorson, for plaintiff.

18          MR. WOTORSON:  Yes.  Those dates are fine, your Honor.

19  However, I would request that your Honor send this case also

20  back to the mediation program.  We tried I think once before

21  and we were not successful, but I think, in light of the

22  Court's decision, the parties, both parties are probably a

23  little bit more educated as to what we have and what we don't

24  have, and we should at least try to get this resolved prior to

25  trial.

L9k2CumC

1      THE COURT:  I am always in favor of something like

2  that, but not if the defendant wouldn't be in favor of it,

3  because otherwise the parties are entitled to a trial of this

4  action.

5      Let me hear from the government.

6      MS. VARGAS:  Your Honor, I would have to confer with

7  my client to determine their settlement position in light of

8  the Court's ruling.  It may be that they are interested in

9  renewing settlement negotiations, but I think I need to have a

10  little time to confer with them before I could determine

11  whether it will be fruitful to go before the mediator.  We

12  don't want to waste anyone's time if our settlement position

13  hasn't shifted.

14      THE COURT:  That's fair enough.  I think lawyers

15  always need to consult with clients.

16      How about the parties letting me know by letter by

17  close of business on October 8 whether they jointly request

18  referral to the mediation program.  You will let me know either

19  that they jointly request referral to the mediation program or

20  that there is no request at the moment for referral to the

21  mediation program.  If there is no request for referral to the

22  mediation program, I don't need to know, and frankly I don't

23  particularly want to know, which party is resisting mediation.

24  That is a matter of indifference to me.  I said at the

25  beginning, in response to Mr. Wotorson's comments, that while I

L9k2CumC

1    am always in favor of parties trying to reach settlement, I

2    also recognize that the parties have a right to have cases

3    litigated and, from my ruling, it should be clear that there

4    are triable issues in this case for both sides.

5              Anything further from the government?

6              MS. VARGAS:  No, your Honor.  We appreciate the time

7    this morning.

8              THE COURT:  Thank you both.  Thank you for good

9    briefing.  Everybody stay safe and stay healthy.  Thank you to

10   the court reporter, and have a good afternoon, everybody.

11             MR. WOTORSON:  Thank you, your Honor.

12             MS. VARGAS:  Thank you.

13                              oOo

14

15

16

17

18

19

20

21

22

23

24

25